## J. W. SMITH v. M. S. NELSON AND ANOTHER.

1. An auctioneer is for many purposes the agent of both the buyer and the seller, and invested, *virtute officii*, with authority to bind each of them.

2. In 1863 an auctioneer announced that Confederate money, being the currency of the country, would be received in payment of bids for the hire of slaves of an estate, hired out for the year to the highest bidder, at the instance of the administrator. *Held*, that the transaction must be regarded as a sale made for Confederate money.

3. This court has uniformly held that Confederate money had no value in law; that the pretended government which issued it had no existence *de jure*; that the so-called money was uttered in violation of law, and in aid of a treasonable rebellion; and that to give it any legal standing in the courts, as the means by which executory contracts are to be carried out, is to acknowledge the legality of the pretended government by which it was issued, and to sanction, *pro tanto*, the rebellion itself.

4 By the fourteenth amendment of the United States Constitution, it has been declared that the Confederate debt shall not be paid, and all of the insurgent States have agreed to this as a condition of their readmission into the Union ; and this court holds that the enforced payment of Confederate money would be, *pro tanto*, a payment of the Confederate debt, in violation of the fundamental law of the land.

APPEAL from Bosque.    Tried below before the Hon. William Chambers.

The following statement of the facts is taken from the brief filed for the appellant, and verified by the transcript :

This suit was instituted by J. W. Smith, as administrator *de bonis non* of the estate of Ridley Robinson, deceased, on a note executed on the first day of January, A. D. 1863, by appellees, who were defendants below, and one R. S. Barnes, to J. C. Frazier, the preceding administrator of said estate.

Barnes was not sued, because dead.    Appellees (defendants) answered, admitting the execution of the note, but that it was the agreement and understanding with parties representing the estate, that the same was to be paid off in Confederate money.

By an amended answer appellees pleaded that the note was for the hire of a negro, hired at auction, and that it was publicly proclaimed, at and before the hiring, that he was to be hired for Confederate money ; and that such was the special agreement between appellees and Frazier, the then administrator.

Appellant replied, alleging that James C. Frazier was, at the time the negro was hired, administrator, and that he hired the negro by virtue of an order of the County Court of Bosque county ; and that said order did not authorize him to hire for Confederate money.

The court below charged the jury, in substance, that if they believed the note was given for Confederate money, they would find the value of the note in Confederate money, for plaintiff.

Appellants asked charges, in substance, that an administrator could only hire by an order of county court.    Second, that an order to hire for money could not be construed to authorize a hiring for Confederate money, and that the hirer was as much bound to know the order as the administrator.    Third, that a request by letter of an administrator to an agent, to hire the negroes, could not authorize him, the agent, to hire for other than lawful money.

The first of these charges was given, the others refused, by the court below.

Judgment was rendered, in accordance with the judge's charge to the jury, for the estimated value of the amount specified in the note for Confederate money.

Motion for new trial by appellants, and overruled by the court.

The evidence, as shown by statement of facts, was, first, the note, which is a promise to pay two hundred and sixty-five dollars—no designation of the kind of money; second, order of county court to hire the negroes of the estate—not specifying any kind of money. The evidence of James Lane, that he hired the negro for Frazier, the administrator; that Frazier requested him to do so by letter, he being absent from home; and that the letter under which he acted did not specify Confederate money; that when he went to hire them (the negroes of the estate) he was asked what sort of money they would be hired for, and he answered, of course, that as Confederate money was the only currency, Confederate money would be taken.

*Coke, Herring & Anderson*, for the appellant.—Now we submit that if it had been the administrator himself speaking at the auction of the negro, that the language used could only have been construed as the expression of an opinion that Confederate money would be received, as he could not speak in a positive manner, so as to make it a part of the contract, and bind creditors and distributees of the estate. But the language used was not that of the administrator, but that of the auctioneer, when the administrator was not present, and who was not authorized so to declare, as he in his testimony says emphatically. The letter under which he was acting did not so authorize. But take the language used by this auctioneer or agent: He is asked by the bystanders, in what money the payment for the hire of the negro would be required. He answers, of course, as Confederate money

is the currency of the country, it will be in Confederate money. This language in its strongest terms could only be equivalent to the declaration that, in the opinion of him, the auctioneer, Confederate money would be taken. This language does not even show that he intended more than to express his opinion.

But, then, if it should be construed that this agent did assert positively, and undertake to stipulate, that the notes should be paid in Confederate money, as the letter written to him by the administrator did not authorize him to hire the negro for Confederate money, he clearly exceeded his authority; and the administrator would not be bound by any act or declaration made in excess of his authority. We grant that a general agent, in the scope of his business, may, by declarations which form part of a contract, bind his principal; and this view of the subject must have misled the court below. But Lane's (the auctioneer's) agency was a special agency, constituted only for a particular purpose; and in this case, says Story, if the agent exceeds the special and limited authority conferred on him, the principal is not bound by his acts; but they become mere nullities so far as he is concerned. (Story on Agency, § 126.)

The agent in this case was a special agent only, to auction the negroes in exact accordance with the letter giving him his authority. This letter authorized him to hire them for money, and, of course, good, lawful money; and parties could infer or presume nothing else. And, as Story says in his note on page 155, fourth edition of his work on Agency, " Of course, where the nature and extent of the real authority conferred on him furnish the only rule to govern the case, the party dealing with the agent must act at his own peril."

The letter spoken of was the only authority, and as this did not authorize the auctioneer to propose to take payment in Confederate money, the party so dealing, in the language of Judge Story, dealt at his own peril. Neither the administrator nor the estate was bound.

But in the next place we submit that the administrator himself was but an agent, acting under the authority of the county court, and could only act as authorized, and no further. The order of the county court authorized him to hire the negroes, and did not authorize him to hire for any particular kind of money. The law implied, then, lawful money of the United States. The administrator, being so bound, could not delegate a greater authority than he himself possessed.

No brief for the appellees has reached the Reporter.

WALKER, J.—This was an action brought in the district court to recover for the hire of slaves. The labor of the slaves for a given term was sold at public auction to the highest bidder. The auctioneer was asked the question by bidders and bystanders, and answered that inasmuch as Confederate money was the currency of the country, it would be received in payment of the hire of the slaves.

An auctioneer is for many purposes the agent of both parties. He has an authority *virtute officii*, to bind both the seller and the buyer. (Story on Agency, § 107; Chitty on Com. & Manuf., 281.) This must be regarded as a sale made for Confederate money, under the repeated decisions of this and other States.

This judgment was, in accordance with the instructions of the court, for the estimated value of Confederate money. This court has uniformly held heretofore, that Confederate money had no value in law. That the pretended government which issued it had no existence *de jure*. That it was uttered in violation of law, and in aid of a treasonable rebellion, the object of which was to overthrow the rightful government of the United States; that it was issued in aid of, and became a means of continuing the rebellion; and that to give it any legal standing whatever in the courts, as the means by which executory contracts are to be carried out, is to acknowledge so far the legality of the pretended government by

which it was issued. And it is no answer to this argument to say that private wants or public necessity required its utterance and use. The truth is, the main purpose of its utterance was the purchase of the material of war, and the payment of troops engaged in fighting against their government. At the beginning of the war, there was the ordinary amount of legally authorized bank paper, and of gold and silver, in circulation in the State of Texas; and it never has been shown, nor will it ever be, that this was not abundantly sufficient for the ordinary wants of the people. So that these contracts cannot be put upon the ground of public necessity.

A very large number of the people of Texas never did recognize the necessity of Confederate money, and it is fair to presume that by far the larger portion of the people would have utterly refused to have anything to do with it, if they had been left to their own choice; for it is notorious that early in the war it became necessary to force it upon the people, by the orders of military commanders, and many who took it in payment of debts did it in duress *per minas*, and with the bayonets of provost guards at their breasts. We hold now, that to give any legal sanction to transactions of this kind is to sanction, *pro tanto*, the rebellion itself.

To those who argue that this so-called money was a necessity or a blessing to the people of Texas, we say, go and look at the ruined homes, the blasted fortunes and the wasted estates, and the long list of bankrupts it has left among us. This would not have been the case if the people of Texas had used no other circulation than that which the law supplied them *ante bellum*. Had they resorted to barter and exchange of commodities, the State would have prospered rather than become bankrupt. She would have saved the public lands of which she has been plundered, and it is very doubtful whether the people could have been forced into that war which has proved so disastrous to the moral and material interests of the whole country.

There is no weight in the argument that Confederate money had an appreciable value, and could at different periods of the rebellion be used in the purchase of property ; for, long before the surrender of the Confederate armies, the logic of events had taught every man that the last holder of the Confederate bill would find it utterly worthless in his hands ; and if it were legally worthless in his hands, it was equally so in the hands of every prior holder.

The United States has declared that the Confederate debt shall not be paid. (Constitution of U. S., XIV amendment.) All of the insurgent States have agreed to this as a condition on which they have been readmitted to the Union; and we hold that every enforcement of the payment of one dollar of this Confederate money is, *pro tanto*, a payment of the Confederate debt, and is so far a violation of the law of the land.

The judgment of the district court will be reversed and the cause dismissed.

Reversed and dismissed.